EMPIRE STATE, INC., Landlord, *v.* GRACELINE HANDBAGS, INC., et al., Tenants, and WOLF'S HANDBAG REPAIR SERVICE et al., Undertenants.

Municipal Court of the City of New York, Borough of Manhattan, May 11, 1948.

*Reuben Golin* and *Jack P. Zimmeth* for landlord.

*Roy M. Lazarus* and *Joseph Liff* for tenants and undertenants.

WAHL, J. Empire State, Inc., the landlord herein, is the owner of the Empire State Building at Fifth Avenue and 34th Street, New York City. Prior to the erection of the Empire State Building, and since, Empire State, Inc., has owned a six-story and penthouse loft building at 27–31 West 33d Street, New York City; this loft building is contiguous to the west wall of the Empire State Building on the 33d Street side of that building.

In this summary proceeding instituted by the landlord against all of the tenants of the entire building at 27–31 West 33d Street, the landlord seeks to invoke the provisions of the emergency rent laws as set forth under subdivision (c) of section 8 of the Business Rent Law: '' (c) The landlord seeks in good faith to recover possession for the immediate purpose of demolishing the building or other rental area with the intention of constructing a new building, and the plans for such construction have been approved by the proper authorities, if such approval is required by law. * * * '' (L. 1945, ch. 314, as amd. by L. 1947, ch. 823.)

In the building under consideration the first story is occupied by several stores and entrances to the premises. The upper five floors are occupied by the other tenants. The Empire State Building contains over one hundred stories, and one of the appurtenances to the Empire State Building is a loading platform. The owner of the two buildings, the landlord herein, in the early part of this year filed an alteration application for both buildings, seeking a permit to make an alteration to both buildings so that the upper five stories at 27–31 West 33d Street would be torn down and the remaining first story would be converted into a loading platform as an appurtenance to, and a convenience for, use in connection with the Empire State Building.

The application seemingly indicates that it is not intended to demolish the existing structure *in toto* but only a major portion thereof and to make changes in what was to remain. A considerable portion of the debris was to be utilized in filling the existing basement excavations and it was intended to salvage minor parts of the existing structure and to incorporate them in the new building. The purpose of this mode of demolition and construction was to save materials difficult to obtain and, indeed, scarce. In a monetary sense, the landlord was not effecting a saving.

The plans were approved by the Department of Housing and Buildings on March 4 and March 8, 1948.

The answer of the tenants consists of a general denial and several affirmative defenses. At the end of the landlord's case, the tenants moved to dismiss the petition on the various grounds more fully set forth in its defenses. However, this court is concerned with only two of the motions based upon the defenses.

In the first motion, the tenants moved for a dismissal of the proceeding because of the acceptance of rent from the tenants for the month of March, 1948, prior to the institution of this

proceeding and therefore claim they were not holdovers at the time of the commencement of this proceeding. The other pertinent motion is based on the ground that the landlord does not seek to recover possession for the purpose of *demolishing* the building and constructing a *new* building.

The petition herein is dated and verified on March 18, 1948. The precept was issued on the 22d of the same month, and the copies of the requisite papers were served upon the various tenants on the 22d of March and thereafter. Obviously the jurisdictional facts which are alleged in the petition did not exist on the verified date nor on the day of the issuance of the precept. The uncontroverted proof is that prior to March 18th the tenants had paid rent for the month of March. Therefore that fact is directly contradictory to the allegation in the petition that the tenants hold over and continue in possession " without the permission of the landlord ".

A tenant who pays rent in advance for a month is entitled to possession of the rented premises for that month against his landlord. This proposition is not vitiated by the fact that the tenant may lose possession because of some breach of a covenant by him, or by an illegal use of the premises; for in these latter instances it is the act of the tenant contrary to the legal rights of possession which deprives him of the possession, and the payment of rent in advance does not relieve him of his own violation. However, if there is no such violation contrary to legal rights of possession, the landlord, having accepted the stipulated rental for a definite period, cannot arbitrarily terminate those rights of possession before they expire by natural limitation. The so-called emergency rent laws did not vary, nor alter, nor amend the provisions of article 83 of the Civil Practice Act, which governs summary proceedings to recover possession of real property, but merely imposed new conditions precedent with which a landlord had to comply before he could bring such a proceeding. (*Lewittes & Sons* v. *Spielmann,* 190 Misc. 35; *Ellenbogen* v. *Caldwell,* 270 App. Div. 946.)

Indeed, subdivision 8 of section 1410 of the Civil Practice Act is further evidence of the legislative intent. This section provides that the acceptance of rent by the landlord during the pendency of a proceeding or after the judgment does not terminate the proceeding thereby, nor are the landlord's rights affected by the receipt of such rent. If the Legislature had intended that the receipt of rent prior to the institution of a

proceeding should not be prejudicial to the right of the commencement of the proceeding under subdivision 1 of section 1410 of the Civil Practice Act, it would have so provided.

In *Gallucio* v. *Moscatiello* (74 N. Y. S. 2d 897) the appellate court in this department said (p. 898), " The collection of the rent in advance February 1 for that month renewed the tenancy and barred this proceeding commenced on February 6." The landlord argues that this case is distinguishable because the premises involved was a dwelling. I fail to see any distinction.

The language in the opinion of Judge HAMMER in *Lewittes & Sons* v. *Spielmann* (*supra*, p. 40) is very pertinent: " The suspended remedies are available to the landlord who shows himself to be within the provided exceptions at the *end of any such rent-paid period.*"

Where the conventional relationship of landlord and tenant exists, either of two factual situations must exist before the landlord can recover possession: (1) by nonpayment of the agreed rent, or, (2) by reason of the tenant holding over after the expiration of his term without the permission of the landlord. The mere statutory right of possession alone does not suffice for he must also show the tenant's term has expired, before the right to the statutory remedy of summary proceedings comes into existence. For in cases of statutory tenancies, such as where the lease has terminated by natural limitation or by conditional limitation, and the tenant continues in possession by virtue of statutory protection, the occupant is neither a trespasser nor a tenant by agreement. The landlord may terminate the statutory tenancy by a demand for possession, and a refusal makes for the termination of such tenancy, and upon such termination the parties revert to the status occupied prior to the enactment of the statute, and thus, the landlord may immediately institute summary proceedings to evict the holdover.

However, Judge EDER, in the *Lewittes* case (*supra*) does not say when this demand is to be made to have the legal effect of terminating the statutory tenancy. It may appear like quibbling over trivialities to question whether or not this demand may properly be made during a rent-paid period, as in this case. when as a practical matter the court could extend the statutory tenancy for a period of six months from the granting of a final order awarding the landlord the delivery of the premises. That, however, is a contingency or, at best, a probability, and while such often forms the basis for a rule of law, it ought not to

be considered, when it may lead to the creation of an anomaly, greatly disfavored in law. If the demand may be made on the 15th or the 25th of a rent-paid period, then it may be made on the second, yes, even on the first after rent has been paid. In such instances the incongruity of the landlord receiving the agreed rent, which the tenant has been held, in law, obliged to pay, and immediately or shortly thereafter making a demand for return of the possession by which the tenant then becomes a holdover or trespasser, is clearly evident. Yet that is what this landlord claims to be his legal right, and requests this court to sanction that assertion. It is not enough to say that the tenant will lose, little or practically nothing, by a demand for possession during a rent-paid period. The question is one of legal rights and duties, and no matter how seemingly small, the effect of a deprivation of a right may appear, the law should not give its approval of such deprivation when it involves discarding long-standing rules of property and principles of law.

Prior to the emergency rent laws and the *Lewittes* case (*supra*) it was well established, both by common law and legislative enactment, that tenancies of uncertain duration could be terminated only by giving certain notice of such termination. Tenancies for a definite term did not require any form of notice, for in such cases the parties were already on notice as to the termination date and the tenant was compelled to quit the premises at the end of the definite term, both by his contract and by law. However, in no case of tenancies for a definite term, or in uncertain tenancies with a stipulated rent for a defined period, e.g., monthly or yearly, could the tenancy be terminated during a rent-paid period unless some act of the tenant inconsistent with his tenancy terminated his right of possession.

If the *Lewittes* case had not established the rule that no notice need be given the statutory tenant, the question presented here would never have arisen, for at least thirty days' notice, before the expiration of the term, would have to be given the tenant and clearly, if the rent had been paid for that term, the landlord could take no steps to recover possession until that term had expired.

The simple solution to the problem, of course, is an amendment to section 232-a of the Real Property Law by which the requirement of a thirty-day notice as a condition precedent to the termination of a monthly or month-to-month tenancy could be extended to statutory tenancies which have been created by

the payment of the monthly rental after the expiration of the prior lease. This is of great import, otherwise it does not require a vivid imagination to visualize the chaotic conditions which will prevail in July of some year when the emergency rent laws expire.

It is my opinion that the landlord in this proceeding clearly manifested its intention that the tenancy should continue at least for the balance of the month, and that is its legal effect. (*Maidman Properties* v. *Rebuilt Machinery Corp.*, 54 N. Y. S. 2d 263, 266.)

The motion to dismiss on this first ground must be granted, and, of course, if this were the only basis for dismissal, it would not be on the merits.

The Legislature was fully aware of conditions which existed in New York City when it enacted the emergency rent laws. The conditions have not improved substantially. (See Legislative Report cited *infra.*) Hence, wherever possible, force and effect should be given to the statutes enacted to curb inflation; and in those instances wherein a landlord may recover possession of the premises, he should be held to strict compliance with the literal terms of the statute.

Under subdivision (c) of section 8, the landlord must establish, amongst other things, that he seeks possession for the purpose of *demolishing* the building with the intention of constructing a *new* building. " Words of ordinary import should receive their understood meaning and the definitions of lexicographers are considered as useful as guide posts in determining the sense in which the words were used." (*Matter of Hardecker* v. *Board of Education,* 180 Misc. 1008, affd. 266 App. Div. 980, affd. 292 N. Y. 584.)

The word " demolish " is defined in Webster's " New International Dictionary " (1947) as follows: " to throw or pull down; to raze; * * * to pull to pieces; hence, to ruin; destroy ".

Here a substantial portion of the premises will be removed in the process, but there is not a complete demolition of the building within the meaning of the statute. The landlord intends to leave the present foundation of the building, the first floor, the cellar, the walls of the first floor, and portions of the second floor. The landlord does not intend to demolish the entire premises but only to alter the same. A building is demolished when reduced to a shapeless mass, and that implies a complete destruction.

The landlord will not construct a new building within the meaning of that definition for the appurtenance which the landlord intends to create will be largely constructed from portions of an old building to which some changes have been added. The plans as filed in the building department disclose that in constructing the loading platform, the landlord will use, for the significant portion of the new appurtenance, portions of the old building.

An analogous situation was presented in the case of *Rosman Realty Corp.* v. *Quinn* (115 Misc. 510) which involved a determination under the housing laws of 1920. The question presented there was whether the premises to be demolished and the building to be erected in its stead came within the meaning of the Emergency Housing Laws of 1920 (L. 1920, ch. 942). The landlord was required under that statute, as a condition precedent to being permitted to recover the premises, to demonstrate that he intended to demolish the same with the intention of constructing a new building. The premises consisted of a seven-story apartment house containing twelve families. The plans and specifications which were filed show that the premises were to be converted to provide housing accommodations for approximately twice that number of families. The physical changes consisted in the removal of many partitions, installation of new bathrooms, introduction of a new water system and new plumbing throughout the building and an additional fire escape. The plan contemplated using the existing foundations, walls, roofs and floors. The Appellate Term reversed the final order for the landlord, and the court, at page 511, said: " It seems to me to be self evident that it was not intended to demolish this building for the purpose of constructing a new one within the meaning of the legislature. While the changes contemplated were radical in many senses, we are not concerned with that feature of the case. The legislature in its discretion has established a test which is clear and free from ambiguity." (See, also, *Stock* v. *Sangro Corp.*, index No. L/T 1015/46, Municipal Court, First District, Manhattan, affd. App. Term [1st Dept.], leave to appeal to Appellate Division denied; *Sangro Corp.* v. *Max Dichtl, et al.*, Index No. L/T 1409/46, Municipal Court, First District, Manhattan, affd. App. Term [1st Dept.]; *Ciampi* v. *Safeway Stores, Inc.*, Index No. L/T 078/1948, Municipal Court, Fifth District, Manhattan.)

At most, the landlord here intends to destroy only a portion of an existing building, and it seems mere sophistry to declare

that the landlord intends to erect a new building. Moreover, the plans as filed by the landlord with the Department of Housing and Buildings of the City of New York have been filed and approved as an alteration to an existing building. The landlord thus by its own admission fails to qualify under the literal and reasonable interpretation of the act.

In drafting the statute, the Legislature intended to protect tenants from unreasonable practices and pressures by landlords, and to secure to the public the continuance of existing commercial and business space. In enumerating the situations in which a landlord might repossess its property, the Legislature employed language which was clear and concise, and if the landlord seeks to take advantage of the prescribed provisions, it should be compelled to comply literally with them or else fail.

The courts have consistently held that literal compliance with the statute is a jurisdictional requirement in an application to evict a statutory tenant. In *Blitzkrieg Amusement Corporation* v. *Rubenstein Bros. Drinks, Inc.*, 184 Misc. 975, it was stated (p. 980): " * * * before this petitioner may recover the possession of these premises, it must meet the literal requirements of the exceptions contained in Section 8 of the Act, * * * The primary purpose of the act was to protect tenants in possession at the time the act became effective and must be liberally construed in their favor."

The intention of the Legislature to continue existing facilities, whether commercial or residential, cannot be doubted. A landlord who attempted to close a building for the reason that its continued operation was unprofitable was denied permission to do so. (*Rothbard* v. *Averell,* 186 Misc. 179.)

It would have been a very simple thing for the Legislature to have included a provision permitting a landlord to recover possession of all or a portion of the premises for the purpose of making extensive alterations or renovations. We may not say that the Legislature did not have such a situation in its contemplation at the time of the enactment of the statute. Since the original enactment, the statutes have been amended and extended on several occasions. Not once has any provision been made for alterations or renovations. We cannot read into the act something that was not intended and thus broaden the scope of the legislation which might ultimately result in defeating the purposes which prompted its enactment. The Legislative report of the New York State Joint Legislative Committee to Study Rents, dated March 8, 1948 (Legis. Doc. 1948, No. 47), and, incidentally, a remarkably concise and well-prepared com-

ment on rent control extension, deserving of wide currency, discusses two amendments to section 8, but nowhere does it indicate any intent to modify subdivision (c) of section 8.

In fact, the landlord is not constructing a building in the real sense of the word. The premises are not intended to be used for continuous occupancy by tenants. The landlord intends to provide facilities for loading and unloading trucks, chiefly for the convenience of the tenants in the Empire State Building.

Therefore, final order is granted in favor of the tenants, dismissing the petition on the merits.